Harrison Kerr TIGRETT, Plaintiff,

v.

THE RECTOR AND VISITORS OF the UNIVERSITY OF VIRGINIA, et al., Defendants.

Civil Action No. 3:99CV00094.

United States District Court,
W.D. Virginia,
Charlottesville Division.

May 12, 2000.

See, also, *Smith v. Rector and Visitors of the University of Virginia,* 78 F. Supp.2d 533.

Clay James Summers, Charlottesville, VA, Michael D. Fitzgerald, Frank L. Watson, III, Frank L. Watson, Jr., Baker, Donelson, Bearman & Caldwell, Memphis, TN, for Plaintiff.

Susan M. Davis, Richard Croswell Kast, University of Virginia Office of General Counsel, Charlottesville, VA, for Defendants.

## OPINION

MOON, District Judge.

Plaintiff Harrison Kerr Tigrett, a student at the University of Virginia ("University"), has filed this complaint against the Rector and Visitors of the University of Virginia, University President John T. Casteen, III, University Vice–President William W. Harmon, individual members of the University's Board of Visitors, individual members of the University's Judiciary Committee, and individual members of a University Fact–Finding Panel alleging violations of his due process rights under 42 U.S.C. § 1983 as well as his First Amendment speech rights. Defendants have moved to dismiss pursuant to Rule 12(b)(6) and/or for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, defendants' motions will be granted in part and denied in part.

## FACTS

The facts in this case are similar to those this Court described in *Smith v. Rector and Visitors of University of Virginia*, 78 F.Supp.2d 533 (W.D.Va.1999), and are set forth below with modifications.

In the early morning hours of November 21, 1997, Harrison Kerr Tigrett went for a drive with four of his fraternity brothers (Bradley Kintz, Richard Smith, Wes McCluney and Wes Kaupinen). Alexander Kory, another University student who was

on foot, encountered Tigrett and his friends and had "verbal interactions" with one or more of the car's occupants. Unfortunately, events escalated to the point where Kintz and Tigrett exited the car to verbally confront Kory. Smith then exited the car and attempted to calm the situation by telling Kory to go home and Kintz and Tigrett to go back to the car. Kory then directed some profanity toward Smith [1] and, in a burst of anger, Smith punched Kory in the face, causing him extensive injuries to the face, jaw, and teeth.[2]

On December 3, 1997, Kory initiated student disciplinary charges against Tigrett, Kintz, Smith, and McCluney pursuant to the procedures of the University Judiciary Committee ("UJC"). The UJC is a student-run disciplinary body charged with handling complaints about student violations of the University's Standards of Conduct. Initially, Tigrett was charged with violating Sections 1 and 5 of the University's Standards of Conduct. Section 1 prohibits:

> Physical or sexual assault of any person on University—owned or leased property or at University—sponsored or supervised functions, or conduct which threatens the health or safety of any such person or the physical or sexual assault of any University student, faculty member, or employee at the local residence of any student, faculty member or employee within the City of Charlottesville or Albemarle County.

Section 5 prohibits:

> Unlawfully blocking or impeding normal pedestrian or vehicular traffic on or adjacent to University property.

Because McCluney was scheduled to graduate the following May, Vice President for Student Affairs William Harmon determined that he would not be subjected to a UJC trial and instead reprimanded him and required him to attend counseling.

A UJC hearing for Smith, Kintz and Tigrett was initially scheduled for February, 1998, but was postponed until after the disposition of pending criminal charges arising from the incident. On May 13, 1998, Tigrett pled *nolo contendere* to a charge of disorderly conduct in Albemarle County General District Court. The UJC hearing was then rescheduled for November 21, 1998.

The day before the rescheduled hearing was to take place, Smith, Smith's father, Tigrett, and Tigrett's student counsel attended a meeting with Harmon. While there is a dispute as to what happened next, the Court is obligated to construe the facts in the light most favorable to the plaintiff. Tigrett alleges that Harmon (at the request of the student defendants) expressed to all concerned that the November 21 hearing should not go forward, but that he first needed to confer with the University's general counsel. While Harmon was initially unable to contact the University's general counsel, he nevertheless directed Tigrett's representative to contact the UJC chairperson to instruct her that the hearing would be postponed. Shortly thereafter the University's general counsel returned Harmon's call, at which time Harmon requested all present to leave the room so that he could engage in a private conversation. Tigrett and his counsel then left to meet with another University official, while Smith and his father waited outside Harmon's office so that they could speak to him after he had finished the telephone conversation. Shortly thereafter, Tigrett was informed by Smith and his father that the University's general counsel had agreed that the hearing would be postponed. The University's general counsel later confirmed that the hearing would be postponed by speaking directly to Smith's father.

---

1. Kory called Smith a "fat ass."

2. While not definitively established, Smith may have also thrown Kory toward the ground and kicked him.

Meanwhile, the UJC held its hearing on November 21 despite the absence of Smith, Kintz and Tigrett and the protests of Tigrett's representative. The UJC found the three guilty and ordered their expulsion from the University. As to Tigrett, the panel found him guilty of violating Sections 1, 5, and 8 of the University's Standards of Conduct. Specifically, Section 8 prohibits:

Disorderly conduct on University-owned or leased property or at a University sponsored function. Disorderly conduct is defined to include acts which break the peace or are lewd, indecent or obscene and which are not constitutionally-protected speech.

Of note, Kory had not initially sought to charge Tigrett with "disorderly conduct" under the University's Standards of Conduct.

On review, Harmon referred the UJC panel's decision to the University's Judicial Review Board ("JRB"), which is charged with hearing certain appeals of UJC decisions. Tigrett also directly appealed the decision to the JRB shortly thereafter. On February 11, 1999, the JRB set aside the UJC panel's decision and remanded the matter for a new hearing. Pursuant to the remand, the UJC named a new hearing panel and scheduled a new hearing for April 17, 1999. However, that hearing was canceled when the UJC chairperson recused herself. Subsequently, the UJC determined that it was unable to hear the case in a timely manner and referred it to Harmon, who then appointed a hearing panel consisting of student, faculty and administration representatives to hear the case and make a recommendation to University President John T. Casteen, III. This panel convened a hearing on May 17, 1999, at which Tigrett appeared, witnesses were called, evidence was presented, and factual findings were made. The panel

found Tigrett guilty of Violating Sections 1 and 8, and then recommended that Tigrett and Kintz be suspended for one semester (not to include a summer session) and seventy-five hours of community service. As for Smith, the panel recommended that he be suspended for two consecutive semesters that could include a summer session. The panel then forwarded its recommendations to Casteen.

Smith's student counsel wrote to President Casteen on May 28, 1999, urging him "to modify that portion of the panel's recommendation which asks that these young men be suspended from school." Casteen reviewed the panel's report and recommendations as well as the entire transcript of the hearing testimony and affirmed the findings of guilt reached by the panel.[3] However, he modified Tigrett's recommended sanctions by imposing a suspension for one full academic year (not to include a summer session), with expulsion in abeyance pending any further violation of the University's Standards of Conduct while a student of the University and with seventy-five hours of pro-bono community service. Casteen similarly increased the sanction imposed on Smith to a suspension for two full academic years. Moreover, Casteen deferred final judgment on the issue pending an appeal of his decision to the JRB, but noted that he had "ultimate and non-delegable statutory responsibility" over the case that he did not wish to waive. The JRB denied Tigrett's appeal on June 22, 1999.

Tigrett then filed this lawsuit on October 22, 1999. Specifically, in Count One Tigrett alleges, among other things, that Harmon and various UJC members[4] violated his due process rights when Harmon represented that the November UJC hearing would be postponed, but the UJC proceeded with the hearing in his absence anyway. Count One also alleges that Ti-

---

3. Unlike Tigrett, Smith admitted his guilt before the May panel. Accordingly, Casteen only reviewed the panel's recommended sanction as it related to Smith.

4. The named UJC members are John Hevner, Matthew O'Malley, Steve Saunders, Mark Kringlen, Alton Powell Clark, Priya Kumar, and Emily Halayko.

grett's due process rights were violated when the University tried and convicted him of violating Section 8 without reasonable notice. Count Two names Casteen, Harmon, and members of the University's Board of Visitors ("BOV")[5], claiming that the UJC was acting under their control and that they had failed to properly instruct, train, supervise, and control the UJC Defendants in the performance of their duties. Count Three claims that various members of the May panel violated Tigrett's rights generally and with regard to his convictions under Sections 1 and 8 specifically. Count Four names Casteen and Harmon as their actions relate to the May hearing. Count Five refers to members of the Board of Visitors and claims they failed to properly instruct, train, supervise, and control Casteen. Count Six names Casteen plus the individual BOV members and claims that they failed to properly instruct, train, supervise, and control Harmon. Count Seven claims that the individual UJC members conspired to violate Tigrett's civil rights in violation of section 1983. Count Eight makes similar allegations concerning Casteen and Harmon. Count Nine is a state-law breach of contract claim. Count Ten (as well as numerous sections of other counts) alleges that Tigrett's free speech rights were violated and that Sections 1 and 8 of the University's Standards of Conduct are facially overbroad or void for vagueness as they apply to speech.

Tigrett requests both injunctive relief and monetary damages. Defendants have moved to dismiss or, in the alternative, for summary judgment. Because extensive documentation has been filed, this Court is able to make some conclusions concerning the case on a summary judgment status; for those claims in which the factual record is less developed, this Court will consider defendant's motion as one to dismiss.

**5.** The named members of the Board of Visitors are John P. Ackerly, III, Charles M. Caravati, Jr., Champ Clark, William G. Crutchfield, Jr., William H. Goodwin, Jr., T. Keister Greer, Elsie Goodwyn Holland, Timothy B. Robertson, Terence P. Ross, Albert H. Small, Elizabeth A. Twohy, Henry L. Valentine, II, Walter F. Walker, Benjamin P.A. Warthen, James C. Wheat, III, and Joseph E. Wolfe.

## ANALYSIS

### 1. 11th Amendment Considerations

■ This Court has already held that the Rector and Visitors of the University, as an instrumentality of the state, is immune from suit in federal court. See Cobb v. Rector and Visitors of Univ. of Va., 69 F.Supp.2d 815, 823–24 (W.D.Va.1999); see also Collin v. Rector and Bd. of Visitors of Univ. of Va., 873 F.Supp. 1008, 1013 (W.D.Va.1995); Wilson v. University of Va., 663 F.Supp. 1089, 1092 (W.D.Va.1987); Seminole Tribe of Florida v. Florida, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996); Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984); Hans v. Louisiana, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). Moreover, to the extent that Tigrett has sued all other individual defendants in their official capacities, those suits are barred to the extent plaintiff seeks monetary relief. See Cobb, 69 F.Supp.2d at 824; see also Will v. Michigan Dep't of State Police, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). Of course, the 11th Amendment neither bars Tigrett's suit against the individual defendants in their official capacities to the extent that he seeks prospective injunctive relief, see Cobb, 69 F.Supp.2d at 824; see also Quern v. Jordan, 440 U.S. 332, 337, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979); Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), nor his suit against the individual defendants in their personal capacities for monetary damages. See Cobb, 69 F.Supp.2d at 824; see also Hafer v. Melo, 502 U.S. 21, 27, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991).

■ In Count Nine of his complaint, plaintiff claims that the Board of Visitors breached its contract with him by not as-

suring that the procedures set forth in the UJC Constitution and Bylaws and the JRB's appeal procedures were observed. However, the Eleventh Amendment bars plaintiff's breach of contract claims, except to the extent he seeks prospective injunctive relief. *See Pennhurst,* 465 U.S. at 121, 104 S.Ct. 900.

### 2. Claims brought in the Smith Case

■ In *Smith,* 78 F.Supp.2d 533, this Court considered substantially similar claims arising from the same core of events as is before the Court in the instant case. In *Smith,* this Court allowed plaintiff's claims surrounding the November UJC hearing to go forward, but dismissed those claims surrounding the May hearing panel and Casteen's subsequent modification of that panel's recommendation. As an initial matter, plaintiff in this case asks this Court to reconsider its ruling in *Smith* as it relates to all matters arising from the May hearing panel and Casteen's subsequent modification.

Despite plaintiff's request, this Court believes that its decision in *Smith* was sound and accordingly declines to reconsider its ruling. Thus, *Smith* is controlling here to the extent that plaintiff raises claims that are similar to those brought in *Smith,* necessitating the dismissal of all identical or substantially-similar claims in this case as they relate to the May hearing panel and the subsequent decision by Casteen to increase plaintiff's punishment.

Conversely, defendants argue that this Court should dismiss plaintiff's claims regarding the November UJC hearing because this case can be factually differentiated from *Smith.* Specifically, defendants argue that plaintiff's own pleadings reveal that Harmon did not directly tell plaintiff or his student counsel that the November hearing had been postponed, because neither of them were present when he allegedly made the assertion to Smith and his

father after speaking with the University's general counsel. Thus, defendants argue, plaintiff relied on hearsay in not appearing at the hearing. However, defendant's argument strikes this Court as being a distinction without a difference; if Harmon did communicate to Smith and his father that the November hearing would be postponed, then it may have been reasonable for Tigrett to rely on third-party communications concerning Harmon's directive. If, on the other hand, Harmon did not communicate that the hearing would be postponed, then neither Smith nor Tigrett has a cause of action anyway. In any event, the facts (construed in the light most favorable to plaintiff) at minimum reveal that Harmon indicated to Tigrett that the November hearing should not go forward, which is enough to allow his claim to survive a motion to dismiss.

Accordingly, to the extent Tigrett makes similar claims as the plaintiff in *Smith,* this Court will follow its earlier decision, allow those claims relating to the November UJC hearing to proceed, and dismiss those claims similar to Smith's that relate to events surrounding the May hearing panel.

### 3. Section 8—Procedural Due Process

■ In addition to claims that are similar to those brought in *Smith,* Tigrett alleges that his due process rights were violated when the University failed to notify him that he was being charged with violating Section 8 of the University's Standards of Conduct. The basis for plaintiff's claim is that Kory's initial UJC complaint did not include a Section 8 disorderly conduct charge. Since UJC procedures require that a student be provided with written notification of the charges being brought against them, since Kory did not initially charge Tigrett with violating Section 8, and since it is not normal UJC protocol to permit an amendment to a complaint[6], plaintiff argues that the defen-

---

**6.** The UJC Constitution states that student disciplinary complaints must be filed within forty-five calendar days of the time of the complainant first knew or should have known of the identity of the alleged offender.

dants violated his constitutional rights by charging him with violating Section 8 *only after* he had entered a *nolo contendere* plea to a disorderly conduct charge in Albemarle County General District Court.

Plaintiff's claim needs to be analyzed separately as it relates to the November UJC hearing and the May hearing panel. With regard to the former, this Court finds that plaintiff has stated a claim upon which relief can be granted. As always, this Court must construe the facts in the light most favorable to the plaintiff. In that light, plaintiff was charged with and convicted of violating Section 8 when the November UJC panel held its hearing in plaintiff's absence. Of course, this analysis is consistent with plaintiff's other claims relating to the November hearing, except that plaintiff may have an argument that—even if he did not believe that the hearing had been postponed and had decided to attend—his trial and conviction under Section 8 was improper because he had no adequate notice that a Section 8 charge was being brought against him. Under these circumstances, plaintiff would not have had notice and an opportunity to be heard. *See Dixon v. Alabama State Bd. of Educ.,* 294 F.2d 150 (5th Cir.1961); *Gorman v. University of Rhode Island,* 837 F.2d 7, 12 (1st Cir.1988); *Carey v. Maine Sch. Admin. Dist. No. 17,* 754 F.Supp. 906, 918 (D.Me.1990); *Reilly v. Daly,* 666 N.E.2d 439, 444 (Ind.Ct.App. 1996).

This Court has greater difficulty reaching the same conclusion concerning Section 8 charges and the May hearing panel. On the one hand, it is certainly plausible that plaintiff, having been charged with and convicted of violating Section 8 in November, would have notice that he would face similar charges at a *de novo* trial in May. On the other hand, plaintiff has presented some evidence that, even after the November hearing, the issue of whether subsequent hearings would include a Section 8 charge were, at best, unclear.

■ The law is well-settled that notice "should contain a statement of the specific charges and grounds which, if proven, would justify [the punishment]." *Dixon,* 294 F.2d at 158, *adopted by Fourth Circuit in Henson v. Honor Committee of U. Va.,* 719 F.2d 69, 74 (4th Cir.1983). At this point, this Court is unable to make a determination of whether plaintiff had *constitutionally-required* notice that he would face Section 8 charges in the May hearing, and will allow plaintiff's claim to go forward to the extent he can prove-up that he did not have that notice. However, this Court views the issue very narrowly. Plaintiff will need to do more than merely demonstrate that the University violated its own procedures or rules by amending Kory's complaint or by allowing a Section 8 charge to be leveled more than 45 days after the incident, since "a violation of state law (for purposes of this case the student judicial code may be treated as a state law) is not a denial of due process, even if the state law confers a procedural right." *Osteen v. Henley,* 13 F.3d 221, 224 (7th Cir.1993). As stated by the Fourth Circuit:

> It is axiomatic, as the University rightly points out, that both in this and related contexts of state action, not every departure from a state agency's stated or customary procedures constitutes a denial of constitutionally guaranteed procedural due process.... Indeed, the fundamental principle seems now established that in these cases the source of procedural guarantees is to be found solely in the due process clause rather than in any specific procedures provided by the state.

*Jones v. Board of Gov'rs of Univ. of N.C.,* 704 F.2d 713, 716–17 (4th Cir.1983) (citations omitted). *See also Carboni v. Meldrum,* 949 F.Supp. 427, 437 (W.D.Va.1996), *aff'd,* 103 F.3d 116, 1996 WL 698069 (4th Cir.1996) ("At best, Plaintiff's claims lead to a conclusion that the defendants may have violated her procedural rights as guaranteed by state law. Such violations do not give rise to federal constitutional

concern.... Federal guarantees of due process only require that a student faced with disciplinary charges at a university be given notice of the charges against her, and a reasonable opportunity to present her side of the story to a neutral decision-maker." (citations omitted)). Moreover, merely showing that the University failed to inform plaintiff that he was violating Section 8 *per se* will be insufficient to withstand summary judgment. *See L.Q.A. By and Through Arrington v. Eberhart*, 920 F.Supp. 1208, 1219 (M.D.Ala.1996) ("failure to designate a particular code violation by letter or number does not violate the plaintiff's due process" where plaintiff was informed of basis for expulsion). Since the basis of due process is "the opportunity to be heard at a meaningful time and in a meaningful manner," *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), plaintiff will need to show that the University provided him with no meaningful basis for believing that he would be charged with disorderly conduct under the University's Standards of Conduct. This showing will need to be made regardless of any procedural (but non-constitutionally based) safeguards the University's rules may have provided.

*4. Sections 1 and 8—Freedom of Speech*

In addition to his civil rights and procedural due process claims, plaintiff argues that Sections 1 and 8 of the University's Standards of Conduct are "facially overbroad" because they purport to limit speech in addition to "fighting words" and are thus unconstitutional. Plaintiff also argues that the two sections are "unconstitutionally vague." Plaintiff brings both an as-applied and facial challenge to Sections 1 and 8. This Court finds plaintiff's arguments to be without merit.

■ The Court begins with the as-applied challenge. In *Chaplinsky v. New Hampshire*, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942), the Supreme Court held that "the insulting or 'fighting' words— those which by their very utterance inflict injury or tend to incite an immediate breach of the peace" are not entitled to First Amendment protection because "such utterances are no essential part of any exposition of ideas, and are of such slight value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." *Id.* at 572, 62 S.Ct. 766. Plaintiff responds that Tigrett in no way threatened, intimidated, or touched Kory; thus, the fighting words doctrine does not apply.

Plaintiff's argument is a cart without a horse. On the one hand, plaintiff claims that, because fighting words were not used, plaintiff's speech falls outside of the "fighting words exception" and thus was constitutionally-protected. On the other hand, plaintiff has declined to state what words were used or how his speech was protected. Plaintiff's argument goes nowhere because, while it is not necessary to identify the exact words used, it is necessary for a plaintiff to identify protected speech. *See Dennison v. County of Frederick, Va.*, 921 F.2d 50 (4th Cir.1990); *Roper v. County of Chesterfield, Va.*, 807 F.Supp. 1221 (E.D.Va.1992). Here, plaintiff has failed to do both.

Even if plaintiff's speech (which consisted of little more than name-calling and cursing) was somehow constitutionally protected, the as-applied claim still fails. Reasonable time, place, and manner regulation may be applied to speech irrespective of content. *See Erznoznik v. City of Jacksonville*, 422 U.S. 205, 209, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975); *see also Rosenfield v. New Jersey*, 408 U.S. 901, 903, 92 S.Ct. 2479, 33 L.Ed.2d 321 (1972) (Powell, J., dissenting) ("The right of free speech, however, has never been held to be absolute at all times and under all circumstances"). "Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument." *Cantwell v. Con-*

*necticut,* 310 U.S. 296, 309–10, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). As the United States Court of Appeals for the District of Columbia Circuit has noted:

> Apart from punishing profane or obscene words which are spoken in circumstances which create a threat of violence, the state may also have a legitimate interest in stopping one person from 'inflict(ing) injury' on others by verbally assaulting them with language which is grossly offensive because of its profane or obscene character.

*Williams v. District of Columbia,* 419 F.2d 638, 646 (D.C.Cir.1969) (citation omitted).

■ It is also worth noting that Section 8 does not directly address speech. Specifically, the language of that provision prohibits "disorderly conduct" which is "defined to include sexual harassment and *acts* which breach the peace or are lewd, indecent, or obscene ..." (emphasis added). The provision does not directly prohibit speech that is lewd, indecent, or obscene, but instead prohibits those activities that are lewd, indecent, or obscene. This subtle but important distinction is borne out in case law upholding statutes that include limited restrictions on speech to the extent that the manner of expression is in itself unreasonable. *See United States v. Occhino,* 629 F.2d 561, 563 (8th Cir. 1980); *see also United States v. O'Brien,* 391 U.S. 367, 376, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) ("when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms").

What is clear from the record of this case is that plaintiff engaged in a prolonged verbal colloquy with Kory in the middle of the night that involved little more than "verbal banter," name-calling, and curse words. That verbal interchange escalated to the point where Tigrett exited the car in which he was riding and physically confronted Kory. Minutes later, Smith threw a punch and Kory was sent to the hospital. What Tigrett may have actually said to Kory is far less important than the conduct he engaged in: Tigrett was held accountable for actions that were a link in a chain of events that resulted in the assault on a fellow student. Even if Kory never felt directly threatened, Tigrett's use of curse words had the effect of provoking and antagonizing another student for no apparent reason. There is no basis in constitutional law to protect that type of activity.

■ Plaintiff also makes a facial challenge to Section 8 by arguing that it is overbroad. Alternatively, plaintiff argues that a savings clause in the section that prohibits disorderly conduct and acts except for those "which are not constitutionally-protected speech" is void for vagueness and makes the entire section void for vagueness. In a nutshell, plaintiff argues that the savings clause "trades the problem of overbreadth for one of vagueness" and cites *National People's Action v. City of Blue Island, Ill.,* 594 F.Supp. 72, 76 (N.D.Ill.1984), to argue that savings clauses create the defect of unconstitutional vagueness.

Initially, it is worth noting that plaintiff does not appear to be claiming that Section 8, minus the savings clause, is unconstitutionally vague.[7] Turning then to the overbreadth doctrine, the Court first observes that the bar for finding Section 8 unconstitutional is particularly high since it involves a conflagration of speech and

---

7. The closest that plaintiff comes to making this assertion is when he states that Section 8 "has the potential to punish speech and acts that are constitutionally protected." Plaintiff also notes that "Section 8 is unconstitutionally vague and its 'savings clause' cannot cure this legal defect." Other than these two statements (one of which is a blanket assertion), plaintiff in no way attempts to argue that, but for the savings clause, Section 8 is void for vagueness.

conduct. *See Broadrick v. Oklahoma*, 413 U.S. 601, 615–16, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973) (function of facial overbreadth adjudication "attenuates as the otherwise unprotected behavior that it forbids the State to sanction moves from 'pure speech' toward conduct"). Thus, there is some question over whether plaintiff in fact has standing to challenge Section 8 since it sanctions conduct, but since the issue of standing is less than clear the Court will look at the merits of plaintiff's claim.

Plaintiff's main argument is that the savings clause is itself void for vagueness and makes the entire section void for vagueness. However, striking down laws, ordinances, or other similar codes as facially void for vagueness is disfavored. *Schleifer by Schleifer v. City of Charlottesville*, 159 F.3d 843, 853 (4th Cir.1998), *cert. denied*, 526 U.S. 1018, 119 S.Ct. 1252, 143 L.Ed.2d 349 (1999). "The root of the vagueness doctrine is a rough idea of fairness. It is not a principle designed to convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited." *Colten v. Kentucky*, 407 U.S. 104, 110, 92 S.Ct. 1953, 32 L.Ed.2d 584 (1972). Against this backdrop, the Court rejects plaintiff's void for vagueness argument.

Plaintiff's attempt to compare this case to *City of Blue Island* is inapposite since all of the parties in that case initially agreed that the statute (which had nothing to do with disorderly conduct) was unconstitutional as applied to the plaintiff, regardless of its savings clause. Thus, the issue before that court was whether a savings clause could salvage an otherwise invalid statute. That is not an issue here, since this Court does not find Section 8 to be constitutionally overbroad. More significant, however, is *Schleifer*, 159 F.3d at 853, in which the Fourth Circuit analyzed a savings clause to a city curfew that excepted those minors who are "exercising

First Amendment rights protected by the United States Constitution." As the court noted:

> We decline to punish the City for its laudable effort to respect the First Amendment. . . . A broad exception from the curfew for such activities fortifies, rather than weakens, First Amendment values. Plaintiffs basically attempt to place city councils between a rock and a hard place. If councils draft an ordinance with exceptions, those exceptions are subject to a vagueness challenge. If they neglect to provide exceptions, then the ordinance is attacked not for adequately protecting First Amendment freedoms. It hardly seems fitting, however, for courts to chastise elected bodies for protecting expressive activity. The Charlottesville ordinance is constitutionally stronger with that protection than without.

*Id.* (citation omitted). Keeping in mind that courts should be skeptical about void for vagueness arguments (especially when the statute primarily involves conduct), and with the admonition from the Fourth Circuit concerning the effectiveness of savings clause, this Court rejects plaintiff's facial challenge to the constitutionality of Section 8 and finds the provision to be neither facially overbroad nor unconstitutionally vague. In short, it provides reasonable notice of prohibited acts while excepting First Amendment speech.

Additionally, plaintiff argues that Section 1 abridges protected speech because of either overbreadth or vagueness. That argument does not detain the Court long, since Section 1 deals exclusively with conduct by prohibiting physical or sexual assault. Accordingly, plaintiff's claims with respect to the facial constitutionality of Section 1 will be dismissed.

### 5. Bias of the May 1999 Hearing Panel

■ Plaintiff, like that in *Smith*, argues that prejudicial press coverage of events surrounding the incident as well as a vola-

tile campus atmosphere[8] precluded him from receiving a fair and just hearing in front of the May panel. While this Court rejected a similar argument in *Smith*, it feels compelled to further elaborate its position on this issue in light of plaintiff's argument that "It was *not* Plaintiff's duty to allege bias in the proceeding; rather, it was the University's duty to provide an unbiased panel and accord Plaintiff a fair and impartial hearing." (emphasis in original).

Plaintiff's view is akin to arguing that a litigant has a right to a fair trial, and therefore it is not the duty of his attorney to ever object during the course of that trial. Nevertheless, plaintiff's counsel had an opportunity to question the panel members prior to the May 17 proceedings and, after doing so, declined to raise an objection of impermissible bias. Plaintiff has done nothing more than allege bias, but cannot, as a matter of law, show how he was denied *due process* when he was given an opportunity to question members of the panel concerning their alleged bias but declined to challenge their impartiality Thus, plaintiff has waived any argument with regard to bias. *See Satterfield v. Edenton–Chowan Bd. of Educ.*, 530 F.2d 567, 574–75 n. 2 (4th Cir.1975) ("A claim of disqualifying bias or partiality on the part of a member of the judiciary or an administrative agency must be asserted promptly after knowledge of the alleged disqualification.... [A] party may not sit idly by and tacitly consent to an improper hearing in order to assert a cause of action at a later time."); *Duke v. North Texas St. Univ.*, 469 F.2d 829, 834 (5th Cir.1972) ("Alleged prejudice of university hearing bodies must be based on more than mere speculation and tenuous inferences."); *Hargrave v. Landon*, 584 F.Supp. 302, 305 (E.D.Va.1984) ("To show that he was denied a fair trial or an impartial jury due to adverse pre-trial publicity, a petitioner must ordinarily demonstrate an actual, identifiable prejudice attributable to that publicity on the part of members of his jury"); *Harrison v. Commonwealth*, 183 Va. 394, 399, 32 S.E.2d 136 (1944) (a juror who had read newspaper coverage of the crime will not be disqualified "in the absence of a fixed impression, bias or prejudice created thereby"). Accordingly, plaintiff's claims with regard to bias on the part of the May panel fail.

## CONCLUSION

The Rector and Visitors of the University of Virginia, as an instrumentality of the state, is immune from suit in federal court. All claims against individually-named defendants sued in their official capacities are dismissed to the extent they seek monetary damages. Defendant's motion to dismiss plaintiff's state law breach of contract claim is granted, except to the extent plaintiff seeks prospective injunctive relief. Defendants' motion to dismiss and/or for summary judgment is granted for all claims concerning or relating to the May, 1999 hearing panel and President Casteen's subsequent modification, with the exception of plaintiff's claim that he was denied due process due to inadequate notice that he would be charged with violating Section 8 of the University's Standards of Conduct. Defendants' motion to dismiss and/or for summary judgment is denied for all claims concerning or relating to the November, 1998 UJC hearing. Defendants' motion to dismiss and/or for summary judgment is granted with regard to all First Amendment claims.

## ORDER

Plaintiff Harrison Kerr Tigrett, a student at the University of Virginia, has filed this complaint against the Rector and

---

**8.** In arguing that the University atmosphere following the November hearing became "poisoned," plaintiff points to a series of negative newspaper articles in the University's student newspaper urging the plaintiff's "re- expulsion," leaflets that were distributed on campus advocating the plaintiff's lynching, and a web site dedicated to counting the number of days since plaintiff's alleged November expulsion.

Visitors of the University of Virginia, University President John T. Casteen, III, University Vice–President William W. Harmon, individual members of the University's Board of Visitors, individual members of the University's Judiciary Committee, and individual members of a fact-finding committee alleging violations of his due process rights under 42 U.S.C. § 1983 and his First Amendment freedom of speech rights. Defendants have moved to dismiss pursuant to Rule 12(b)(6) and/or for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedures.

For the reasons set forth in the attached Opinion and in this Court's prior ruling in *Smith v. Rector and Visitors of University of Virginia,* 78 F.Supp.2d 533 (W.D.Va. 1999):

- Defendants' motion to dismiss Count One is DENIED
- Defendants' motion to dismiss Count Two is DENIED
- Defendants' motion for summary judgment is GRANTED as to Count Three, except to the extent Plaintiff alleges he did not receive adequate notice that he would be charged with violating Section 8 of the University of Virginia Standards of Conduct
- Defendants' motion for summary judgment is GRANTED as to Count Four, except to the extent Plaintiff alleges he did not receive adequate notice that he would be charged with violating Section 8 of the University of Virginia Standards of Conduct
- Defendants' motion for summary judgment is GRANTED as to Count Five, except to the extent Plaintiff alleges he did not receive adequate notice that he would be charged with violating Section 8 of the University of Virginia Standards of Conduct
- Defendants' motion for summary judgment is GRANTED as to Count Six to the extent it generally purports to state a claim concerning events surrounding the May, 1999 hearing and Casteen's subsequent modification; the motion to dismiss and/or for summary judgment is DENIED to the extent Count Six purports to state a claim concerning events surrounding the November 1998 hearing or to the extent it purports to state a claim concerning plaintiff's being charged with violating Section 8 of the University of Virginia Standards of Conduct

- Defendants' motion to dismiss Count Seven is DENIED
- Defendants' motion for summary judgment is GRANTED as to Count Eight, except to the extent it purports to state a claim concerning plaintiff's being charged with violating Section 8 of the University of Virginia Standards of Conduct
- Defendants' motion to dismiss is GRANTED as to Count Nine, except to the extent plaintiff seeks prospective injunctive relief
- Defendants' motion for summary judgment is GRANTED as to Count Ten
- Defendants' motion for summary judgment is GRANTED as to any and all remaining First Amendment claims contained in the complaint

All references in this Order are to the First Amended Complaint.